FILED

[JAN 1 4 2012

United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 10-61121-ASW |
| LUIS RAMIREZ FLORES AND BERTHA OROPEZA FLORES, | Chapter 13 |
| Debtors. | |

**MEMORANDUM DECISION FOLLOWING EVIDENTIARY
HEARING REGARDING DEBTORS' MOTION TO AVOID
LIEN OF SANTA CRUZ COMMUNITY CREDIT UNION**

Before the Court is the motion ("Motion") by debtors Luis Ramirez Flores and Bertha Oropeza Flores ("Debtors") to determine the value and status of the second priority deed of trust held by creditor Santa Cruz Community Credit Union ("SCCCU") against the Debtors' primary residence located at 517 Marnell Avenue, Santa Cruz, California (the "Property"). Debtors seek a determination that SCCCU's second deed of trust is not secured in any amount and thus may be treated as unsecured in Debtors' chapter 13 plan. SCCCU opposes the Motion. Debtors are represented by Jason Vogelpohl, Esq. Of Central Coast Bankruptcy, Inc. SCCCU is represented by Thomas Caudill, Esq. Of The Law Offices of Thomas Caudill.

An evidentiary hearing on the Motion was held on September 6, 2011, and the matter has been submitted for decision. At the

evidentiary hearing, Debtors called Michael J. Wilson ("Wilson"),
an appraiser, as a witness.  SCCCU called Bruce McGuire
("McGuire"), an appraiser, as a witness.

This Memorandum Decision constitutes the Court's findings of
fact and conclusions of law, pursuant to Rule 7052 of the Federal
Rules of Bankruptcy Procedure.

I.

FACTS

Debtors commenced this case by filing a petition under
Chapter 13 of the Bankruptcy Code on October 26, 2010.  Debtors'
main asset is the Property.  Two deeds of trust have been recorded
on the Property.  The senior obligation and first deed of trust on
the Property is held by EMC Mortgage ("EMC").  The junior
obligation and second deed of trust is held by SCCCU ("SCCCU's
Lien").

On the bankruptcy petition date, the amount owing to EMC was
no more than $561,904.56.  On April 4, 2011, Debtors filed the
Motion.  On April 13, 2011, SCCCU filed an objection to the Motion.
The hearing, initially held on July 26, 2011, was continued to
September 6, 2011 for an evidentiary hearing.

At the September 6, 2011 hearing, each party offered an expert
witness to opine as to the value of the Property at the time of
Debtors' bankruptcy petition.  Both experts prepared written
reports and those reports were entered into evidence.  Direct
testimony was submitted by declaration, with cross-examination, re-
direct, and re-cross-examination taken at the evidentiary hearings.
Debtors' expert witness Michael J. Wilson is a certified appraiser

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   of real property working as a real estate appraiser primarily in
2   Monterey County, but also working in San Benito County, Santa Clara
3   County, and Santa Cruz County.  SCCCU's expert witness Bruce
4   McGuire is a certified appraiser of real property.  Both appraisers
5   were qualified to testify as experts concerning the value of the
6   Property.

7        Wilson holds a license from the State of California to
8   conduct real estate appraisals.  Wilson was first an Appraiser
9   Trainee on January 30, 2004.  Wilson was then a licensed
10  Residential Appraiser on July 7, 2006 before being licensed as a
11  Certified Residential Appraiser in April 2009.  Wilson has received
12  over 220 hours of local and online instruction from various
13  approved continuing education providers with the State of
14  California, Office of Real Estate Appraisers.  Wilson testified
15  that Wilson appraises roughly one-hundred and twenty properties per
16  year, but has only appraised ten properties in Santa Cruz County --
17  none of which were on the east side of Santa Cruz where the
18  Property is located.  Debtors asked Wilson to determine the market
19  value of the Property as of the petition date, October 26, 2010.

20       Wilson testified that Wilson believed the fair market value of
21  the Property was $550,000.00 as of October 26, 2010.  Wilson based
22  that conclusion upon a sales comparison analysis of five comparable
23  properties.  A sales comparison approach to value is based upon an
24  analysis of comparable properties within the same neighborhood in
25  light of factors such as the real estate market of the particular
26  neighborhood, the school systems, and the dwelling's
27  characteristics including square footage, age, and condition.
28

Wilson's report contained five comparable properties. The sales price of the Wilson comparables ranged from $500,035 to $639,000. Wilson's comparable properties were located from .21 to 1.25 miles away from the Property. Three of the five properties were sold before Debtors' bankruptcy petition date. Comparable number four sold on November 16, 2010 -- shortly after Debtors' bankruptcy. Comparable number five's sale is listed as pending in Wilson's report, meaning that whether the property actually closed escrow and, if so, when, and at what price, is unknown.

At the evidentiary hearing, Wilson was cross-examined regarding several aspects of his report. First, counsel for SCCCU confirmed with Wilson that only three of Wilson's five comparable properties had closed escrow before the date of Debtors' bankruptcy petition. Wilson verified that comparable properties four and five had not closed escrow prior to October 26, 2010. Wilson explained that common appraisal practice when given a retroactive appraisal assignment is to include properties that were in contract before the effective date, but that closed escrow within thirty to forty-five days after the effective date. Comparable number four closed escrow on November 16, 2010 -- twenty-one days after the date of Debtors' bankruptcy petition. As noted above, Wilson testified that Wilson did not know at the time Wilson submitted Wilson's appraisal report, nor at the time of the evidentiary hearing, whether comparable number five ever closed escrow.

Counsel for SCCCU also inquired as to Wilson's use of $55 per square foot when adjusting for the gross living area variance between the Property and Wilson's comparable properties. Wilson explained that Wilson had consulted two Santa Cruz appraisers who

1  were familiar with the area -- Dave Becrera and Laura Bishop.

2  Wilson testified that Bishop suggested Wilson use $55-$75 per

3  square foot when making adjustments and that $75 per square foot

4  would be used for extremely high-end properties.  Wilson also

5  testified that Becrera suggested that Wilson use $60-$65 per square

6  foot.

7      SCCCU's expert witness Bruce McGuire is a California Certified

8  Residential Real Estate Appraiser.  McGuire has been an appraiser

9  for over thirty-six years and estimates that McGuire has appraised

10  thousands of properties during that time.  McGuire was a Deputy

11  Assessor in Santa Cruz County for ten years and has been a

12  California State Probate Referee for Santa Cruz County since 1998.

13  McGuire testified that McGuire believed the fair market value of

14  the Property was $595,000.00 as of October 26, 2010.  McGuire based

15  that conclusion upon a sales comparison analysis of six comparable

16  properties.  McGuire emphasized in McGuire's Declaration that

17  McGuire's valuation is conservative for the following reasons:

18  (1) in 2010 and prior to October 26, 2010, there were three sales

19  on the same street as the Property for $595,000, $650,000 and

20  $770,000, respectively; (2) McGuire did not adjust for the

21  Property's upgraded and remodeled granny unit; and (3) McGuire did

22  not adjust for any increase in the value of the Property derived

23  from the Property's two separate units.

24      The sales prices of McGuire's comparable properties ranged

25  from $573,000 to $720,477 and were sold between February 17, 2010

26  and August 17, 2010.  All of McGuire's comparable properties were

27  listed as sold before the date of Debtors' bankruptcy petition in

28

McGuire's report.  The comparable properties were located from .02
to 1.27 miles away from the Property.

At the evidentiary hearing, counsel for Debtors asked McGuire
about McGuire's criticism of Wilson's lack of knowledge of Santa
Cruz's Accessory Dwelling Unit ("ADU") Program.  McGuire testified
that Wilson was not familiar with the ADU program, and that the
existence of Santa Cruz City building permits have an impact on
the value of the property.  For example, McGuire explained that
McGuire's comparable number one has a legal ADU, which would affect
the value for comparable number one.

Counsel for Debtors also inquired as to McGuire's use of the
property located at 503 Marnell Avenue (McGuire's comparable number
six) as a comparable property.  The reason for the inquiry was that
McGuire's comparable number six is roughly forty-six percent
smaller than the Property.  McGuire explained that comparable
number six is located four houses from the Property and that,
because location is the most important factor when searching for
comparable properties, McGuire thought that comparable six was
still a very good indicator of the Property's value.  McGuire also
explained that, despite being forty-six percent smaller than the
Property, comparable number six sold for $595,000 on March 19,
2010, roughly seven months prior to the petition date.  This is the
exact same figure used for McGuire's appraisal of the Property.

Counsel for Debtors also asked McGuire about the variance
between McGuire and Wilson's living area adjustment figures.
Wilson used $55 per square foot when making adjustments while
McGuire used $100 per square foot.  McGuire explained that McGuire
used the Building Residential Technique to calculate the his $100

Case: 10-60096    Doc# 53    Filed: 01/14/12    Entered: 01/17/12 13:28:20    Page 6 of 23
MEMORANDUM DECISION FOLLOWING
EVIDENTIARY HEARING, ETC.

6

1  per square foot figure.  The Building Residential Technique

2  subtracts the value of the land from the total value of the

3  property to determine the value of the actual home, and then

4  divides the resulting value by the square footage.  McGuire's

5  Declaration also explains that as part of McGuire's review of

6  Wilson's appraisal, McGuire contacted Bercera -- the same

7  individual that Wilson consulted -- and McGuire and Bercera went

8  through the adjustment calculation.  McGuire and Bercera came up

9  with $105.00 per square foot.

10  Lastly, counsel for Debtors asked McGuire why a $30,000 time

11  adjustment was made for comparable number six, which was sold on

12  March 29, 2010, and comparable number five, which was sold on

13  March 19, 2010, while a $25,000 adjustment was made for comparable

14  number one, which was sold on March 26, 2010.  McGuire was not able

15  to explain the discrepancy.

16

17  II.

18  ANALYSIS

19  Debtors' Motion requests this Court to determine the value and

20  status of SCCCU's Lien as wholly unsecured and void.  Debtors

21  contend that because the fair market value of the Property on the

22  bankruptcy petition date was less than the debt secured by EMC's

23  first priority trust deed, SCCCU's Lien was wholly unsecured at the

24  time of the bankruptcy.  SCCCU opposes the Motion arguing the fair

25  market value of the Property exceeded EMC's first priority lien;

26  thus SCCCU's second priority trust deed was at least partially

27  secured and entitled to the "antimodification" provision of

28  Bankruptcy Code section 1322(b)(2).

1    Debtors seek to value SCCCU's Lien on the Property based on

2    Bankruptcy Code section 506(a)(1), which states:

3        An allowed claim of a creditor secured by a lien on
         property in which the estate has an interest . . . is a
4        secured claim to the extent of the value of such
         creditor's interest in the estate's interest in such
5        property . . . and is an unsecured claim to the extent
         that the value of such creditor's interest . . . is less
6        than the amount of such allowed claim.

7    11 U.S.C. § 506 (a)(1).  If the Court finds SCCCU's Lien to be wholly

8    unsecured, as Debtors contend, then SCCCU is not the "holder of a

9    secured claim" whose rights are subject to the "antimodification"

10   protection of Bankruptcy Code section 1322(b)(2).  Zimmer v. PSB

11   Lending Coporation (In re Zimmer), 313 F.3d 1220 (9th Cir. 2002).

12   The consequence of such a finding is that Debtors could provide for

13   SCCCU's claim through Debtors' chapter 13 plan as a general unsecured

14   claim, rather than a secured claim.  Zimmer, 313 F.3d at 1227.

15   Conversely, if the Court finds SCCCU's Lien to be secured by even

16   $1.00, the "antimodification" protection of Bankruptcy Code section

17   1322(b)(2) applies and the claim must be paid as a secured claim and

18   cannot be modified by Debtors' chapter 13 plan.

19       Bankruptcy Code section 506(a)(1) instructs that when a court is

20   requested to determine the value of collateral, "such value shall be

21   determined in light of the purpose of the valuation and of the

22   proposed disposition or use of such property..."  11 U.S.C.

23   § 506(a)(1).  When the debtors intend to stay in their house, the

24   proper valuation of the house under Bankruptcy Code section 506(a)

25   is the fair market value.  Taffi v. United States of America (In re

26   Taffi), 96 F.3d, 1190, 1192 (9th Cir. 1996).  The fair market value

27   is not the "replacement" value because the house is not being

28   replaced.  Neither is it the "foreclosure" value because no

foreclosure is intended in the chapter 13 plan. <u>Taffi</u>, 96 F.3d at
1192. The fair market value is "the price which a willing seller
under no compulsion to sell and a willing buyer under no compulsion
to buy would agree upon after the property has been exposed to the
market for a reasonable time." <u>Taffi</u>, 96 F.3d at 1192. Debtors
intend to stay in the Property, cure the loan owed to EMC, and treat
SCCCU as a general unsecured creditor.

For purposes of granting or denying the Motion, this Court does
not need to determine the exact value of the Property. <u>In re Serda</u>,
395 B.R. 450 (Bankr. E.D. Cal. 2008). The Court only needs to
determine whether or not the value of the Property at the time of
Debtors' bankruptcy petition was greater than, equal to, or less than
the amount of the senior secured debt owed to EMC. <u>Serda</u>, 395 B.R.
at 453. Here, the amount owing to the first deed of trust holder was
no more than $561,904.56 on the bankruptcy petition date.

Debtors bear the initial burden of proof of overcoming any
presumption established by the stated value in the secured creditor's
proof of claim. <u>Serda</u>, 395 B.R. at 454. The secured creditor has
the ultimate burden of persuasion to demonstrate, by a preponderance
of the evidence, the value of the collateral which secures its claim.
<u>In re Southmark Storage Associates Ltd. Partnership</u>, 130 B.R. 9, 10
(Bankr. D. Conn. 1991).

Both parties' expert witnesses used the sales comparable method
to estimate the fair market value of the Property at the time of
Debtors' bankruptcy petition. The hearing on the matter lasted
roughly three hours wherein both experts testified. The Court
considered all the evidence admitted at trial, including the
testimony of both experts. In addition, the Court prepared its own

1 statistical analysis based solely upon the appraisal reports
2 submitted by the two experts.  (Attached as Exhibits 1-4).[1]

3 **A. SCCCU's Motion in Limine**

4 On August 26, 2011, SCCCU filed a written motion in limine to
5 exclude the expert opinion testimony of Debtors' expert appraiser
6 Wilson.  SCCCU's motion argues that Wilson is not an expert appraiser
7 as to property values in the Santa Cruz area because: (1) by Wilson's
8 own admission, Wilson has never undertaken a residential appraisal in
9 the specific area where the Property is located; (2) since 2006,
10 Wilson has appraised approximately ten properties in Santa Cruz
11 County; (3) Wilson is not familiar with the East Santa Cruz area; and
12 (4) Wilson had not heard of the Santa Cruz ADU Program -- which is
13 unique to Santa Cruz in connection with residential properties --
14 prior to submitting Wilson's appraisal.

15 Debtors opposed SCCCU's motion, arguing that Wilson has been a
16 certified residential appraiser since April 2009, is in good standing
17 with the Office of Real Estate Appraisers, and has received over 220
18 hours of local and online instruction from various approved
19 continuing education providers with the State of California Office of
20 Real Estate Appraisers.  Debtors argued that if SCCCU believes that
21 Wilson's ignorance of Santa Cruz's ADU Program is relevant, SCCCU may
22 cross-examine Wilson at the evidentiary hearing.

23 As explained in the <u>Bankruptcy Evidence Manual</u> by Judge Barry
24 Russell:

25

26

---

27 [1] The Court does not imply that the fair market value of any
property is purely a statistical calculation, but it recognizes
28 that such analysis can be instructive when confronted with
conflicting and multifaceted data.

The admissibility of expert testimony under Rule 702 requires that two preliminary determinations be made by the court. Rule 104(a). First, the court must decide whether expert testimony could assist the trier of fact in understanding the evidence or determining a fact in issue. The court may be required as an aspect of this inquiry to determine whether a sufficiently reliable body of scientific, technical, or other specialized knowledge has been developed. Second, the court must also determine whether the witness called is properly qualified to give the testimony sought. The witness may be qualified as an expert on the bases of either knowledge, skill, experience or education or a combination thereof. Morganroth & Morganroth v. DeLorean, 213 F.3d 1301 (10th Cir. 2000) (Expert opinion evidence in affidavit form could properly be considered on motion for summary judgment.); In re Moyer, 421 B.R. 587 (Bkrtcy. S.D. Ga. 2007) (Expert testimony will assist trier of fact, as required for it to be admissible, if it concerns matters that are beyond understanding of lay persons. Burden of laying proper foundation for admission of expert testimony is on party offering the expert. Admissibility of expert testimony must be shown by preponderance of evidence.).

Hon. Barry Russell, Bankruptcy Evidence Manual, §702:1 (2011 ed.).

The Bankruptcy Evidence Manual further explains:

Once a witness has qualified as an expert by the Court, the lack of strong qualifications affects the weight rather than the admissibility of the evidence. In re 3dfx Interactive, Inc., 389 B.R. 842 (Bankr. N.D. Cal. 2008) (Even uncontradicted expert testimony is not necessarily conclusive. Court may decline to accept an expert's opinion, in whole or in part, and may reject an expert's opinion based upon its conclusions regarding the expert's credibility). It is for the trier of fact to determine the weight to be given to the testimony of an expert witness. In re Piece Goods Shops Co., L.P., 188 B.R. 778 (Bankr. M.D.N.C. 1995) (plan proponents' expert's testimony given greater weight than objector's expert due to experience and knowledge of relevant facts); Matter of 1616 Reminc Ltd. Partnership, 9 B.R. 679 (Bankr. E.D. Va. 1981); In re Lona, 393 B.R. 1 (Bankr. N.D. Cal. 2008) (Bankruptcy court may simply disregard the testimony of any witness whom it finds not to be credible, and bankruptcy court's credibility determinations are given due regard on appeal).

Id. at § 702:2.

Here, the motion in limine is based not on Wilson's expertise as an appraiser per se, but rather due to Wilson's relative inexperience in appraising residential property where Debtors' residence is

located.  Such concerns have been taken into account in the weight that this Court accords Wilson's testimony.  Accordingly, SCCCU's motion in limine is denied.

**B. Presumption of Value**

As noted above, Debtors' expert, Wilson, analyzed five comparable properties that were located between .21 and 1.25 miles from the Property.  Three of the properties Wilson included in Wilson's report were sold before October 26, 2010 -- the date of Debtors' bankruptcy petition.  Wilson's comparable number four closed escrow on November 16, 2010.  Wilson testified that Wilson did not know whether Wilson's comparable number five had closed escrow as of the date of the evidentiary hearing.  Based on these comparable properties, Wilson concluded that the Property had a fair market value of $550,000 on the petition date.  Debtors have presented sufficient evidence to overcome the presumption of value within SCCCU's claim.

**C. Living Area Adjustment Value**

One of the primary issues discussed at the evidentiary hearing was the discrepancy between the figures used for Wilson and McGuire's living area adjustments.  When using a sales comparison approach to formulate an appraisal value, the appraiser selects recent sales of comparable properties and then makes adjustments to account for differences between the two properties that might account for different sales prices.  For example, if a property that sold one day prior to the effective date was identical to the subject property except that the subject property's home possessed twice the square footage as the earlier sold property, the appraiser would make an adjustment to the earlier sold property's sale price to account for

the smaller home size. While the earlier sold property may have sold
for $500,000, an appraiser might value the subject property at
$600,000 because of the larger home size.[2]

Here, Wilson chose to use a living area adjustment value of $55
per square foot. Wilson, who admitted to being unfamiliar with the
Santa Cruz area, called two local appraisers to ask what an
appropriate living area adjustment value might be. Wilson testified
that one of the appraisers, Laura Bishop, suggested Wilson use an
adjustment value of $55-75 per square foot with the $75 value
representing extremely high-end property. Wilson also testified that
the other appraiser, Dave Becrera, suggested Wilson use an adjustment
value of $60-65 per square foot. Wilson testified that Becrera later
told Wilson that Becrera knew of McGuire and told Wilson that
McGuire's use of $100 per square foot was on the high side.

McGuire chose to use a living area adjustment value of $100 per
square foot. In coming to this value, McGuire used the Building
Residential Technique -- a mathematical formula used at the Appraisal
Institute to arrive at the square foot adjustment for sales price for
square foot. The Building Residential Technique subtracts the value
of the land from the total value of the property to determine the
value of the actual home, and then divides the resulting value by the
square footage.

In McGuire's Declaration, McGuire explained that McGuire went
through the adjustment calculation with Becrera and came up with
$105.00 per square foot. McGuire also stated at trial that Becrera
told McGuire that Becrera did not give Wilson a specific range of

---

[2] These examples are purely made-up. They have no basis in
reality for purposes of the instant dispute.

1 values to use for Wilson's appraisal -- rather Becrera directed
2 Wilson to a webpage.

3     The Court finds McGuire's use of $100 per square foot more
4 persuasive than Wilson's use of $55 per square foot.  McGuire was
5 able to demonstrate to the Court exactly how McGuire arrived at the
6 $100 figure through a mathematical analysis.  The Court also
7 considered McGuire's statement that the Appraisal Institute uses the
8 Building Residential Technique through the Appraisal Institute's
9 course work and text books to become a designated SRA or MAI --
10 professional designations given by the Apprisal Institute.  Further,
11 no evidence was used to show that McGuire's use of $100 was
12 inappropriate.  Lastly, McGuire's statement in McGuire's Declaration
13 that a $55 per square foot adjustment was the adjustment used in
14 Santa Cruz approximately two decades ago supported the use of a
15 higher adjustment value.

16     **D. Analysis of Comparable Properties**

17     Another major issue presented at trial was each appraiser's
18 selection of comparable properties and the appraisal of the Property
19 derived from those comparable properties' values.  In analyzing each
20 appraiser's comparable properties, the Court performed its own
21 statistical analysis.  (See Exhibits 1-4).

22     Wilson used five comparable properties.  The average distance of
23 the comparable properties from the Property is .66 miles.  The
24 average adjusted sales price of the comparable properties is $558,107
25 and the median adjusted sales price of the comparable properties is
26 $550,000.  Excluding properties with an unknown close of escrow date,
27 the average adjusted sales price is $572,625 and the median adjusted
28 sales price is $558,750.

As the Court found McGuire's $100 per square foot figure to be
more persuasive than Wilson's $55 per square foot figure when making
living area adjustments, the Court also analyzed Wilson's comparable
properties using a $100 per square foot adjustment. Using the $100
per square foot adjustment, the average adjusted sales price for
Wilson's comparable properties is $569,140 while the median adjusted
sales price is $552,200. Using the $100 per square foot adjustment
and excluding properties with an unknown close of escrow date, the
average adjusted sales price is $579,250 and the median adjusted
sales price is $557,550.

McGuire used six comparable properties. The average distance of
the comparable properties from the Property is .52 miles. The
average adjusted sales price is $672,430 and the median adjusted
sales price is $696,550. No properties closed escrow after the date
of Debtors' bankruptcy petition and McGuire used a $100 per square
foot figure when making living area adjustments, so no further
calculations were necessary.

In sum, using an adjustment value of $100 per square foot when
making living area adjustments, and excluding properties with an
unknown close of escrow date, Wilson's average adjusted comparable
sales price is $17,345.44 greater than the value of EMC's first deed
of trust and Wilson's median adjusted comparable sales price is
$4,354.56 less than the value of EMC's first deed of trust. Using
the same restrictions, McGuire's average adjusted comparable sales
price is $110,525.44 greater than the value of EMC's first deed of
trust and McGuire's median adjusted sales price is $134,645.44
greater than the value of EMC's first deed of trust. Using the same
restrictions and including the comparable properties used by both

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1 Wilson and McGuire, the average adjusted sale price is $72,253.44
2 greater than the value of EMC's first deed of trust and the median
3 adjusted sales price is $89,095.44 greater than the value of EMC's
4 first deed of trust.

5 No evidence was presented at trial that persuaded the Court that
6 any of the properties with known close of escrow dates was an
7 inappropriate comparable property, and the Court has found that
8 McGuire's use of $100 per square foot for making living area
9 adjustments is more persuasive than Wilson's $55 per square foot
10 figure. Therefore, the fact that, excluding properties with an
11 unknown close of escrow date and using a $100 figure when making
12 living area adjustments, the average and median adjusted sales values
13 for Wilson and McGuire's combined comparable properties are greater
14 than the value of EMC's first deed of trust suggests that the value
15 of the Property is greater than the value of EMC's first deed of
16 trust.

17 **E. McGuire's Comparable Property Number Six**

18 In addition to the Court's calculations, the Court also found
19 McGuire's comparable property number six to be independently
20 persuasive. At trial, McGuire testified that location is the most
21 important factor used when selecting comparable properties.
22 Comparable number six is four houses away from the Property. This
23 close proximity controls for factors affecting home values that might
24 otherwise be unaccounted for.

25 McGuire's comparable property number six sold on March 29, 2010
26 for $595,000 -- despite the fact that comparable number six has 1,364
27 fewer square feet of gross living area than the Property. In other
28 words, comparable number six sold for $45,000 more than Wilson's

1  appraisal of the Property despite being roughly half the size of the
2  Property and having two fewer bedrooms and one less bathroom.  The
3  only other adjustment made to comparable six that might account for
4  the greater sales price was the time of sale.  When making
5  adjustments for time, Wilson adjusted down 3.25% for Wilson's
6  comparable number two which sold on March 19, 2010, and McGuire
7  adjusted down $30,000 for the same property.  Even disregarding the
8  differences in size and number of bedrooms and bathrooms between
9  McGuire's comparable number six and the Property, Wilson's time
10 adjustment would yield an adjusted value of $575,662.50 for McGuire's
11 comparable number six and McGuire's time adjustment would yield an
12 adjusted value of $565,000.  Both values are greater than the value
13 of EMC's first deed of trust, which suggests that the value of the
14 Property is significantly greater than the value of EMC's first deed
15 of trust.  In sum, the fact that comparable number six sold for
16 $595,000 on March 29, 2010 was very persuasive evidence to the Court.
17
18                            III.
19                         CONCLUSION
20     Based on the evidence admitted at hearing and the arguments of
21 counsel, the Court finds McGuire's appraisal to be more accurate than
22 Wilson's appraisal.  McGuire was able to show statistically that a
23 $100 per square foot figure was appropriate when making gross living
24 area adjustments.  Additionally, the Court's statistical analysis of
25 Wilson and McGuire's comparable properties suggests that the value of
26 the Property as of the date of Debtors' bankruptcy petition was
27 greater than the value of EMC's first deed of trust.  Lastly,
28 McGuire's comparable property number six, which is four houses down

1  from the Property and has roughly half the living area, two fewer
2  bedrooms and one fewer bathroom than the Property, sold for over
3  $40,000 more than the value of EMC's first deed of trust.  The Court
4  therefore finds that the value of the Property as of the date of
5  Debtors' bankruptcy petition was greater than the value of EMC's
6  first deed of trust

7       For the foregoing reasons, Debtors' Motion to determine the
8  value and status of SCCCU's Lien as wholly unsecured and void is
9  denied.  The Court finds that the value of the Property was greater
10 than the amount secured by the first deed of trust.  Accordingly,
11 SCCCU's secured claim is at least partially secured and is entitled
12 to the protection of Bankruptcy Code section 1322(b)(2).  Counsel for
13 SCCCU shall prepare a proposed form of order, serve it on counsel for
14 Debtors, and submit it to the Court.

15

16

17 Dated:    1|14|12

18                                        ARTHUR S. WEISSBRODT
                                          UNITED STATES BANKRUPTCY JUDGE
19

20

21

22

23

24

25

26

27

28

MEMORANDUM DECISION FOLLOWING
EVIDENTIARY HEARING, ETC.                    18

Court Service List

Luis Flores
517 Marnell Ave
Santa Cruz, CA 95062

Bertha Flores
517 Marnell Ave
Santa Cruz, CA 95062

Santa Cruz Community Credit Union
324 Front Street
Santa Cruz, CA 95060

Santa Cruz Community Credit Union
PO Box 1877
Santa Cruz, CA 95061

Jason Vogelpohl
Central Coast Bankruptcy Inc.
532 Pajaro St.
Salinas, CA 93901

Thomas Caudill
The Law Offices of Thomas Caudill
1025 North Fourth Street
San Jose, CA 951112

Devin Derham-Burk
P.O. Box 50013
San Jose, CA 95150-0013

Office of the U.S. Trustee / SJ
U.S. Federal Bldg.
280 S 1st St. #268
San Jose, CA 95113-3004

**Exhibit 1**

| | Bruce McGuire's Comparables (for SCCCU) | | | | | |
|---|---|---|---|---|---|---|
| Comparable | Address of Comparable | Proximity to the Subject Property | Close of Escrow | Close of Escrow Pre-Petition? | Comparable Price | Comparable Price Using Gross Building Area Adjustment of $100 per square foot |
| #1 | 310 Marnell Avenue | 0.17 | 3/26/2010 | YES | $691,900 | $691,900 |
| #2 | 201 Marnell Avenue | 0.34 | 2/17/2010 | YES | $573,600 | $573,600 |
| #3 | 365 Gault Avenue | 0.59 | 7/16/2010 | YES | $720,477 | $720,477 |
| #4 | 87 Hagermann | 0.72 | 8/17/2010 | YES | $631,000 | $631,000 |
| #5 | 124 Caledonia Street | 1.27 | 3/19/2010 | YES | $701,200 | $701,200 |
| #6 | 503 Marnell Avenue | 0.02 | 3/29/2010 | YES | $716,400 | $716,400 |

**Exhibit 2**

| | Michael J. Wilson's Comparables (for Debtors) | | | | | |
|---|---|---|---|---|---|---|
| Comparable | Address of Comparable | Proximity to the Subject Property | Close of Escrow | Close of Escrow Pre-Petition? | Comparable Price | Comparable Price Using Gross Building Area Adjustment of $100 per square foot |
| #1 | 365 Fairmont Avenue | 0.21 | 2/1/2010 | YES | $567,500 | $552,200 |
| #2 | 124 Caledonia Street | 1.25 | 3/19/2010 | YES | $639,000 | $671,000 |
| #3 | 201 Marnell Avenue | 0.34 | 2/25/2010 | YES | $550,000 | $530,900 |
| #4 | 121 San Juan Avenue | 0.43 | 11/16/2010 | NO | $534,000 | $562,900 |
| #5 | 129 Belmont Street | 1.07 | unknown | NO | $500,035 | $528,700 |

## Exhibit 3

| Appraiser | Average Proximity to the Subject Property | Average Sales Price | Median Sales Price | Average Sales Price Excluding Properties with Unknown Close of Escrow Date | Median Sales Price Excluding Properties with Unknown Close of Escrow Date |
|---|---|---|---|---|---|
| Bruce McGuire | 0.52 | $672,430 | $696,550 | $672,430 | $696,550 |
| Michael J. Wilson | 0.66 | $558,107 | $550,000 | $572,625 | $558,750 |

## Exhibit 4

| Appraiser | Average Proximity to the Subject Property | Average Sales Price Using Gross Building Area Adjustment of $100 per square foot | Median Sales Price Using Gross Building Area Adjustment of $100 per square foot | Average Sales Price Excluding Properties with Unknown Close of Escrow Date and Using Gross Building Area Adjustment of $100 per square foot | Median Sales Price Excluding Properties with Unknown Close of Escrow Date and Using Gross Building Area Adjustment of $100 per square foot |
|---|---|---|---|---|---|
| Bruce McGuire | 0.52 | $672,430 | $696,550 | $672,430 | $696,550 |
| Michael J. Wilson | 0.66 | $569,140 | $552,200 | $579,250 | $557,550 |
| Both Appraisers | 0.58 | $625,480 | $631,000 | $635,158 | $651,000 |